******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESTHER WETHINGTON *v.* JOSHUA WETHINGTON
(AC 45824)

Moll, Seeley and Prescott, Js.

*Syllabus*

The defendant appealed to this court from the judgment of the trial court
dissolving his marriage to the plaintiff and from certain orders finding
him in contempt. The plaintiff commenced the dissolution action in
November, 2019, and thereafter filed several motions for contempt pen-
dente lite alleging, inter alia, that the defendant had violated the auto-
matic orders through his financial transactions in October, 2019. During
the pendency of the action, the parties executed a stipulation pendente
lite providing, inter alia, that, following the sale of the marital residence,
the defendant would make weekly support payments to the plaintiff
and would also place $46,000 in escrow for the sole benefit of the
plaintiff. The plaintiff alleged in a separate contempt motion that the
defendant had failed to make all of the agreed upon support payments.
In dissolving the marriage, the court found that the primary causes of
the breakdown of the marriage were the defendant's excessive drinking
and abusive behavior toward the plaintiff and that the defendant was
not credible. The court granted, inter alia, several of the plaintiff's
motions for contempt and summarily denied the defendant's postjudg-
ment motions to reargue. *Held*:

1. The trial court improperly granted certain of the plaintiff's motions for
   contempt insofar as the court adjudicated the defendant in contempt
   of the automatic orders for his conduct prior to the effective date of
   those automatic orders and abused its discretion in denying the defen-
   dant's related motion to reargue: as a matter of law, the defendant could
   not be adjudicated in contempt of the automatic orders for his actions
   in October, 2019, as, pursuant to the clear and unambiguous language
   of our rule of practice (§ 25-5), the defendant was not subject to the
   automatic orders until they had been served on him, through counsel,
   in November, 2019; accordingly, the case was remanded with direction
   to grant the defendant's motion to reargue and to deny the plaintiff's
   motions for contempt relating to any of the defendant's financial conduct
   in October, 2019.

2. The defendant could not prevail on his claim that the trial court, in
   ordering him to pay $49,167 to the plaintiff as relief flowing from a
   contempt adjudication for his underpayment of required unallocated
   support, improperly failed to credit him for the $46,000 that he had
   escrowed, following the sale of the marital residence, in accordance
   with the parties' stipulation; the clear and unambiguous language of the
   stipulation demonstrated that the plaintiff was entitled to the $46,000
   in addition to the weekly support payments, as the plain terms of the
   provision requiring the defendant to escrow $46,000 did not place condi-
   tions on the plaintiff's right to access those funds or minimize the
   defendant's obligation in a separate provision requiring him to make
   weekly support payments to the plaintiff, as those provisions imposed
   independent financial obligations on the defendant.

3. The trial court properly granted the plaintiff's motion for contempt alleging
   that the defendant's purchase of a motor vehicle during the pendency
   of the action violated the automatic orders: this court rejected the
   defendant's proposition that the purchase of the motor vehicle was a
   customary and usual expense authorized pursuant to the automatic
   orders, particularly in light of the trial court's finding that the defendant
   owned another vehicle; moreover, insofar as the defendant contended
   that his trial testimony established that his personal circumstances justi-
   fied this purchase, this court noted that the trial court repeatedly did
   not credit the defendant's testimony, including testimony concerning
   his finances.

4. This court concluded, after a review of the record, that the trial court
   did not abuse its broad discretion in distributing the parties' assets,
   particularly in light of the trial court's findings that the defendant was
   at fault for the breakdown of the parties' marriage and that he had

engaged in financial maneuvers that dissipated the parties' funds and left the plaintiff with less funds available in her bank accounts.

5. The defendant could not prevail on his claim that the trial court abused its discretion in denying three of his motions to reargue: the defendant's motions relating to the trial court's award of $49,167 to the plaintiff in unallocated support and its distribution of the parties' assets did not raise any viable claims entitling him to reargument, as the record did not reflect that the court overlooked any controlling principle of law or misapprehended the facts in relation to these orders.

Argued October 16, 2023—officially released February 13, 2024

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the plaintiff filed motions for contempt; thereafter the case was tried to the court, *Egan, J.*; judgment dissolving the marriage and granting certain other relief and finding the defendant in contempt; subsequently, the court, *Egan, J.*, denied the defendant's postjudgment motions to reargue, and the defendant appealed to this court. *Reversed in part*; *judgment directed*.

*Dante R. Gallucci*, for the appellant (defendant).

*Christopher T. Goulden*, with whom, on the brief, was *Barbara M. Schellenberg*, for the appellee (plaintiff).

*Opinion*

MOLL, J. The defendant, Joshua Wethington, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Esther Wethington. On appeal, the defendant claims that the court improperly (1) granted several motions for contempt pendente lite filed by the plaintiff, (2) distributed the parties' assets, and (3) denied several of his postjudgment motions to reargue. We reverse the judgment of the trial court only with respect to the court's (1) denial of one of the defendant's motions to reargue and (2) grants of two of the plaintiff's contempt motions, in whole or in part, insofar as the court adjudicated the defendant in contempt of the automatic orders pursuant to Practice Book § 25-5 (b)[1] for actions that he committed before the automatic orders had become effective against him. We affirm the judgment in all other respects.

The following facts, which are not in dispute, and procedural history are relevant to our resolution of this appeal. The parties were married in 2010. One child was born of the marriage in 2012. On November 21, 2019, the plaintiff commenced the present dissolution action against the defendant on the ground that the parties' marriage had broken down irretrievably. On December 20, 2019, the plaintiff filed her operative amended complaint.

The matter was tried to the court, *Egan*, *J.*, over the course of four total days in September, 2021, and March, 2022. The court heard testimony from the parties and admitted several full exhibits. At the outset of the first day of trial, the court asked the parties to "confirm the motions going forward." The plaintiff's counsel cited six motions for contempt pendente lite that the plaintiff had filed, namely, (1) two contempt motions filed on March 11, 2020, (2) one contempt motion filed on September 11, 2020, (3) two contempt motions filed on December 11, 2020, and (4) one contempt motion filed on June 22, 2021.[2] On April 11, 2022, each party filed posttrial proposed orders.

On July 29, 2022, the court issued a memorandum of decision dissolving the parties' marriage.[3] The court found that the primary causes of the breakdown of the marriage were (1) the defendant's drinking, which the court found to be "excessive," and (2) the defendant's behavior toward the plaintiff, which included verbal and physical abuse. In addition, the court repeatedly stated that it deemed the defendant's testimony at trial to be not credible. The court entered several financial orders as part of the dissolution judgment, including awarding the plaintiff 60 percent of the net proceeds from the sale of the parties' marital residence in Southport. The court also granted the plaintiff's six motions for contempt identified previously in this opinion.[4] In granting relief as to three of the contempt motions, the

court ordered the defendant to pay the plaintiff a total of $76,895 out of his share of the net proceeds from the sale of the marital residence. The court additionally awarded the plaintiff $25,000 in attorney's fees with respect to the contempt motions.

Between August 16 and 17, 2022, the defendant filed several motions to reargue, to which the plaintiff objected. The court summarily denied the defendant's motions to reargue and summarily sustained the plaintiff's objections.[5] This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

We begin with the defendant's claims concerning the trial court's (1) grants of four of the plaintiff's motions for contempt, namely, (a) the two contempt motions filed on March 11, 2020, (b) the contempt motion filed on September 11, 2020, and (c) one of the contempt motions filed on December 11, 2020, and (2) denial of one of the defendant's motions to reargue.[6] We address each claim in turn.

A

We first turn to the defendant's claims regarding the court's (1) grants of the plaintiff's motions for contempt filed on March 11, 2020, docket entries ##110.00 and 111.00 (contempt motion #110.00 and contempt motion #111.00, respectively), and (2) denial of one of the defendant's motions to reargue, docket entry #214.00 (motion to reargue #214.00), which concerned the court's adjudication of contempt motions ##110.00 and 111.00. With regard to the court's grants of contempt motions ##110.00 and 111.00, the defendant asserts that the court improperly adjudicated him in contempt of the court's automatic orders because his conduct occurred before the automatic orders had become effective against him. As to the court's denial of motion to reargue #214.00, the defendant contends that, in granting contempt motions ##110.00 and 111.00, the court overlooked that, as a matter of law, he could not be held in contempt of the automatic orders until they had become effective against him. We conclude that the court (1) improperly granted contempt motions ##110.00 and 111.00 insofar as the court adjudicated the defendant in contempt of the automatic orders for his conduct prior to the effective date of those automatic orders against him, and (2) overlooked that, as a matter of law, the defendant's actions in October, 2019, could not constitute contempt of the automatic orders and, therefore, abused its discretion in denying motion to reargue #214.00.

The following additional procedural history is relevant to our resolution of this claim. The state marshal's return of service filed in the present action reflects that, on November 21, 2019, the state marshal served an attorney representing the defendant with, inter alia, the summons, the plaintiff's original complaint, and notice

of the automatic orders. See Practice Book § 25-5 (service of automatic orders is "made with service of process of a complaint for dissolution of marriage").

On March 11, 2020, the plaintiff filed contempt motions ##110.00 and 111.00. In contempt motion #110.00, the plaintiff asserted that the defendant violated the automatic orders in failing to deposit certain income into the parties' joint checking account, including $15,000 in monthly disability payments that the defendant began receiving in October, 2019. In contempt motion #111.00, the plaintiff contended that the defendant violated the automatic orders in transferring, between October 23 and 28, 2019, a total of $196,000 from the parties' joint bank accounts into a personal bank account "in contemplation of divorce and while the parties' marriage was in serious jeopardy and undergoing an irretrievable breakdown." The court determined that the defendant's actions violated the automatic orders and granted both contempt motions. The court did not order any specific relief vis-à-vis those contempt motions. It awarded, however, the plaintiff $25,000 in attorney's fees in relation to the plaintiff's various contempt motions.

On August 16, 2022, the defendant filed motion to reargue #214.00. The defendant sought reargument on the basis that, as a matter of law, he could not be held in contempt of the automatic orders for his actions in October, 2019, which predated the effective date of the automatic orders against him.[7] The defendant further argued that the $25,000 attorney's fees award had to be reduced to account for the court's erroneous contempt adjudication. The court summarily denied motion to reargue #214.00.[8]

On appeal, the defendant claims that the court's grants of contempt motions ##110.00 and 111.00 cannot stand insofar as the court adjudicated him in contempt of the automatic orders for his actions in October, 2019, which occurred prior to service of the automatic orders on him in November, 2019. He contends that the automatic orders were not in effect in October, 2019, and that he "could not possibly have had notice of the automatic orders" at that time. The defendant further claims that the court abused its discretion in denying motion to reargue #214.00, in which he asserted that the court overlooked that, as a matter of law, he could not be adjudicated in contempt of the automatic orders for his conduct in October, 2019. We agree.

At the outset, we set forth the following relevant legal principles and standards of review. "Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense. . . . [C]ivil contempt is committed when a person violates an order of court which requires that person in specific and definite language to do or refrain from doing an act or series of acts. . . . In part because the contempt rem-

edy is particularly harsh . . . such punishment should not rest upon implication or conjecture, [and] the language [of the court order] declaring . . . rights should be clear, or imposing burdens [should be] specific and unequivocal, so that the parties may not be misled thereby. . . . To constitute contempt, it is not enough that a party has merely violated a court order; the violation must be wilful. . . . It is the burden of the party seeking an order of contempt to prove, by clear and convincing evidence, both a clear and unambiguous directive to the alleged contemnor and the alleged contemnor's wilful noncompliance with that directive. . . . The question of whether the underlying order is clear and unambiguous is a legal inquiry subject to de novo review. . . . If we answer that question affirmatively, we then review the trial court's determination that the violation was wilful under the abuse of discretion standard." (Internal quotation marks omitted.) *Scott* v. *Scott*, 215 Conn. App. 24, 38–39, 282 A.3d 470 (2022).

Whether the automatic orders were clear and unambiguous is not at issue; rather, the question before us is whether the automatic orders applied to the defendant in October, 2019, before they had been served on him. This presents us with a legal question over which we exercise plenary review. See *Williams* v. *Mansfield*, 215 Conn. App. 1, 10, 281 A.3d 1263 (2022) ("[w]hen . . . a court's decision is challenged on the basis of a question of law, our review is plenary"). Moreover, to the extent that we must interpret and apply the rules of practice, our review is plenary. See *In re Ryan C.*, 220 Conn. App. 507, 524, 299 A.3d 308 ("The interpretive construction of the rules of practice is to be governed by the same principles as those regulating statutory interpretation. . . . The interpretation and application of a statute, and thus a Practice Book provision, involves a question of law over which our review is plenary." (Internal quotation marks omitted.)), cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023).

"[I]n reviewing a court's ruling on a motion to open, reargue, vacate or reconsider, we ask only whether the court acted unreasonably or in clear abuse of its discretion. . . . When reviewing a decision for an abuse of discretion, every reasonable presumption should be given in favor of its correctness. . . . As with any discretionary action of the trial court . . . the ultimate [question for appellate review] is whether the trial court could have reasonably concluded as it did. . . . [T]he purpose of a reargument is . . . to demonstrate to the court that there is some decision or some principle of law which would have a controlling effect, and which has been overlooked, or that there has been a misapprehension of facts. . . . It also may be used to address . . . claims of law that the [movant] claimed were not addressed by the court. . . . [A] motion to reargue [however] is not to be used as an opportunity to have a second bite of the apple . . . ." (Internal

quotation marks omitted.) *First Niagara Bank, N.A.* v. *Pouncey*, 204 Conn. App. 433, 440, 253 A.3d 524 (2021).

Practice Book § 25-5 provides in relevant part that the court's automatic orders "shall apply to both parties, with service of the automatic orders to be made with service of process of a complaint for dissolution of marriage . . . . *The automatic orders shall be effective with regard to the plaintiff . . . upon the signing of the complaint . . . and with regard to the defendant . . . upon service* and shall remain in place during the pendency of the action, unless terminated, modified, or amended by further order of a judicial authority upon motion of either of the parties . . . ." (Emphasis added.)

Pursuant to the clear and unambiguous language of Practice Book § 25-5, the defendant was not subject to the automatic orders until they had been served on him, through counsel, in November, 2019. It necessarily follows that, as a matter of law, the defendant could not be adjudicated in contempt of the automatic orders for his actions in October, 2019, namely, (1) failing to deposit his $15,000 monthly disability payment into the parties' joint checking account[9] and (2) transferring $196,000 out of the parties' joint bank accounts. The court overlooked this legal principle in adjudicating contempt motions ##110.00 and 111.00 and, therefore, abused its discretion in denying motion to reargue #214.00.[10] In light of the foregoing conclusions, the court's denial of motion to reargue #214.00 must be reversed, along with the court's judgment as to its grants, in whole or in part, of contempt motions ##110.00 and 111.00 insofar as the court adjudicated the defendant in contempt of the automatic orders for his conduct in October, 2019, and the case must be remanded to the court with direction (1) to grant motion to reargue #214.00 insofar as the defendant alerted the court that, in adjudicating contempt motions ##110.00 and 111.00, the court overlooked a controlling principle of law, (2) to deny in part contempt motion #110.00, to the extent that the court adjudicated the defendant in contempt of the automatic orders for his actions in October, 2019, and (3) to deny contempt motion #111.00.[11]

B

Turning next to the court's grant of the plaintiff's motion for contempt filed on September 11, 2020, the defendant contends that, in ordering him to pay $49,167 to the plaintiff as relief flowing from the contempt adjudication, the court improperly failed to credit him for funds that he had escrowed in accordance with a stipulation pendente lite executed by the parties and approved by the court. We disagree.

The following additional procedural history is relevant to our resolution of this claim. On July 14, 2020,

the parties executed a stipulation pendente lite (stipulation). Paragraph 3 of the stipulation provided: "Once the marital residence [which was under binder at the time] is sold, the [defendant] shall pay to the [plaintiff] fifty (50%) percent of the total net weekly income received from both Revlon Inc. [(Revlon)] and [Hair-Club] for Men, LLC [(HairClub)].[12] Said weekly support payments represent unallocated alimony and [c]hild [s]upport . . . . The [defendant] shall make said payments into an account of the [plaintiff's] choosing on the day the payments are received by the [defendant]. Said payments shall continue until March 15, 2021, when the [defendant's] severance payments from Revlon . . . end." (Footnote added.) Paragraph 4 of the stipulation provided: "[U]pon the closing of the sale of the marital residence, the [defendant] shall place forty-six thousand ($46,000) dollars in escrow . . . for the sole benefit of the [plaintiff]. Said amount guarantees the [plaintiff] at least four (4) months of support payments, even if the [defendant] becomes unemployed. The [plaintiff] shall be entitled to draw on these funds for moving and living expenses when she moves from the marital residence." The court, *Stewart, J.*, approved the stipulation on July 23, 2020.

In the September 11, 2020 motion for contempt, the plaintiff represented that (1) the marital residence was sold on September 4, 2020, and (2) in accordance with the stipulation, upon receiving the proceeds from the sale, the defendant escrowed $46,000. The plaintiff then asserted that, on September 10, 2020, in violation of the stipulation, the defendant altered his direct deposit authorization such that his HairClub paychecks would be deposited into his personal bank account rather than into the parties' joint account. The plaintiff represented that the defendant believed that she could access the $46,000 held in escrow under the stipulation to pay for her living expenses.

In its decision, the court, *Egan, J.*, found that "[t]he defendant admit[ted] that [pursuant to the stipulation] he was supposed to deposit one half of the [net] weekly income of both employers, Revlon and [HairClub]. However, he took actions such as unilaterally changing the direct deposit of his paycheck to go into his personal account instead of the parties' joint account. The plaintiff did not receive any portion of the net weekly income." The court further found that "[t]he defendant changed his withholdings, which resulted in a substantial reduction in his combined net pay. He admit[ted] that when the stipulation was entered his combined net [weekly] pay was $5771. . . . [T]he defendant transferred [to the plaintiff] monthly amounts such as $4423 (September, 2020), $4861 (October, 2020), and $4760 (November, 2020) rather than [the full amount of] $12,503.83 in each such month. Yet, he did deposit the accurate net amount for the three pay periods in February, 2021, which was prior to an upcoming hearing,

although he denied that he did so based on the anticipated proceeding. . . . [T]he timing of such accurate payments [is] an indication that the defendant understood his obligation [under the stipulation]." The court additionally found that, "[a]s a result of the defendant's actions in denying and limiting the plaintiff access to the undisputed $5771 total net weekly income, the plaintiff was compelled to access the [$46,000] in escrow. . . . [T]he plaintiff was entitled to the escrowed funds in addition to the total net weekly income, which represented unallocated alimony and child support . . . . The defendant continued to deposit less than required at times when his income transitioned to be only from [HairClub]. . . . [T]he defendant failed to pay the plaintiff [unallocated] support as ordered [under the stipulation]. He shall pay her the amount owed based on the underpayments, which total $49,167." (Emphasis omitted.) Later in its decision, the court stated that the plaintiff's September 11, 2020 contempt motion was granted and, as relief, ordered the defendant to pay the plaintiff $49,167 from his share of the net proceeds from the sale of the marital home.

On August 16, 2022, the defendant filed a motion to reargue as to, inter alia, the court's order requiring him to pay the plaintiff $49,167. The defendant argued that the court should have credited the $46,000 that he had escrowed in accordance with the stipulation against the $49,167 awarded to the plaintiff, as the $46,000 held in escrow was intended to guarantee the plaintiff approximately four months' worth of unallocated support payments.[13] The court summarily denied this motion.[14]

On appeal, the defendant does not dispute that he owed the plaintiff $49,167 in unpaid unallocated support pursuant to the stipulation. The defendant contends, however, that the court should have offset the $46,000 that he escrowed per the stipulation, which the plaintiff accessed during the pendency of the present action, against the $49,167 awarded to the plaintiff, leaving a balance of $3167. According to the defendant, the $46,000 escrow provision of the stipulation operated only as security to protect the plaintiff in the event that he failed to remit in full the unallocated support payments owed to her. The plaintiff argues in response that the clear and unambiguous language of the stipulation demonstrated that she was entitled to the $46,000 escrowed amount, *in addition to* one half of the defendant's net weekly income. We agree with the plaintiff.

"The order at issue is the stipulation, entered into by the parties, which was made an order of the court. In domestic relations cases, [a] judgment rendered in accordance with . . . a stipulation of the parties is to be regarded and construed as a contract. . . . It is well established that [a] contract must be construed to effectuate the intent of the parties, which is determined from

the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . Contract language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion . . . . In contrast, an agreement is ambiguous when its language is reasonably susceptible of more than one interpretation. . . . Nevertheless, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Bolat* v. *Bolat*, 191 Conn. App. 293, 298, 215 A.3d 736, cert. denied, 333 Conn. 918, 217 A.3d 634 (2019).

We conclude that, pursuant to the clear and unambiguous terms of the stipulation, the plaintiff was entitled to the $46,000 escrowed amount, as well as to one half of the defendant's net weekly income, following the sale of the marital home. Paragraph 3 of the stipulation required the defendant to pay the plaintiff one half of his net weekly income. Separately, paragraph 4 of the stipulation provided that the defendant would escrow $46,000 "for the sole benefit of the [plaintiff]," with said amount "guarantee[ing] the [plaintiff] at least four (4) months of [unallocated] support payments, even if the [defendant] becomes unemployed," and that the plaintiff would "be entitled to draw on these funds for moving and living expenses when she moves from the marital residence." We construe the plain language of paragraphs 3 and 4 of the stipulation as imposing independent financial obligations on the defendant. Moreover, the plain terms of paragraph 4 did not place conditions on the plaintiff's right to access the $46,000 in escrowed funds or minimize the defendant's obligation pursuant to paragraph 3 of the stipulation to transfer one half of his net weekly income to the plaintiff. Accordingly, we reject the defendant's claim to an offset of $46,000 against the $49,167 awarded to the plaintiff.[15]

C

With respect to the court's grant of one of the plaintiff's motions for contempt filed on December 11, 2020, in which she claimed that the defendant's purchase

of a Mercedes-Benz E350 during the pendency of the present action violated the court's automatic orders, the defendant contends that, on the basis of his testimony at trial, his purchase of the Mercedes-Benz E350 constituted a customary and usual household expense that the automatic orders permitted. We are not persuaded.

The following additional procedural history is relevant to our resolution of this claim. On December 11, 2020, the plaintiff filed a motion for contempt asserting that, in violation of the automatic orders, the defendant unilaterally purchased a Mercedes-Benz E350 for $14,000 for his use while living in Florida. The plaintiff further represented that (1) the defendant traveled from Florida to Connecticut to have parenting time with the parties' child, (2) the defendant owned a motor vehicle, a Mercedes-Benz ML350, that he kept in Connecticut, and (3) on or about November 22, 2020, via email, the defendant asked the plaintiff for permission to purchase a second motor vehicle, which request she denied because she questioned his need for two motor vehicles. In its decision, the court found that, without the plaintiff's permission or leave of the court, the defendant, by his own admission, purchased the Mercedes-Benz E350 for $14,000 in cash during the pendency of the present action. The court further found that the defendant also owned a Mercedes-Benz ML350 valued at $32,000. The court proceeded to grant the December 11, 2020 motion for contempt and ordered the defendant to pay the plaintiff $8400, which calculated to 60 percent of the $14,000 expended by the defendant to purchase the Mercedes-Benz E350, out of his share of the net proceeds from the sale of the marital residence.

"A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in [finding] that the actions or inactions of the [alleged contemnor] were in contempt of a court order. . . . We are mindful that the court's automatic orders, applicable during the pendency of all marital dissolution actions, are set forth in Practice Book § 25-5 (b) and provide in relevant part: (1) Neither party shall sell, transfer, exchange, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action. . . . The purpose of the automatic orders in marital dissolution actions is to maintain the status quo of the assets within the marital estate so that they may be distributed by the court at the time of dissolution. . . . In light of these legal principles, it is clear that a violation of the court's automatic orders will not arise when expenditures are used for customary and usual expenses." (Citations omitted; internal quotation marks omitted.) *Grant* v. *Grant*, 171 Conn. App. 851, 859–60, 158 A.3d 419 (2017).

On the basis of the record, we reject the defendant's proposition that his purchase of the Mercedes-Benz E350 was a customary and usual expense authorized pursuant to the automatic orders, particularly in light of the court's finding that the defendant owned another motor vehicle, a Mercedes-Benz ML350, valued at $32,000. Insofar as the defendant contends that his trial testimony established that his personal circumstances justified this expenditure, we note that the court repeatedly did not credit his testimony, including testimony concerning his finances. See *Delena* v. *Grachitorena*, 216 Conn. App. 225, 231, 283 A.3d 1090 (2022) ("[i]t is the exclusive province of the trier of fact to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony" (internal quotation marks omitted)). Thus, we conclude that the court properly granted the plaintiff's December 11, 2020 motion for contempt.

## II

The defendant also claims that the trial court improperly distributed the parties' assets. We disagree.

"[General Statutes §] 46b-81 governs the distribution of the assets in a dissolution case. . . . That statute authorizes the court to assign to either spouse all, or any part of, the estate of the other spouse. . . . In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates. . . . Moreover, [w]e have iterated that there is no set formula the court is obligated to apply when dividing the parties' assets and . . . the court is vested with broad discretion in fashioning financial orders. . . . As a panel of this court once expressed, the court has vast discretion in fashioning its orders." (Citations omitted; internal quotation marks omitted.) *Fronsaglia* v. *Fronsaglia*, 202 Conn. App. 769, 777, 246 A.3d 1083 (2021). "Generally, we will not overturn a trial court's division of marital property unless it misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was [its] duty to regard." (Internal quotation marks omitted.) Id., 776.

The following additional procedural history is relevant to our disposition of this claim. In its decision, in addition to finding that the breakdown of the parties'

marriage was caused by the defendant's (1) excessive drinking and (2) abusive conduct toward the plaintiff, the court discredited the defendant's testimony regarding actions that he took in relation to finances and found that "[h]is financial control and transactions resulted in his accounts having substantially more funds than the plaintiff's accounts and dissipation of funds." As part of its orders allocating the parties' assets, the court awarded the plaintiff (1) $132,297.80, constituting 60 percent of the net proceeds from the sale of the marital home, (2) 60 percent of the parties' joint and individual bank accounts,[16] (3) 60 percent of the defendant's retirement accounts, subject to gains and losses,[17] and (4) $34,620, constituting 60 percent "of [certain] rent paid [by the defendant] to his parents and reduction in bank account funds."[18] The court additionally awarded the plaintiff (1) $76,895 in relief in granting three of the plaintiff's contempt motions, constituting (a) 60 percent of the amount that the defendant paid for his Mercedes-Benz E350, or $8400, (b) approximately 60 percent of the payoff amount of a loan on the defendant's Mercedes-Benz ML350, or $19,328, and (c) the sum of the unpaid unallocated support payments owed to the plaintiff pursuant to the stipulation, or $49,167, and (2) $25,000 in attorney's fees vis-à-vis the plaintiff's contempt motions.

The defendant maintains that the court's orders allocating the parties' assets were "grossly inequitable" and "create[d] an unfair, and unjust division of marital assets," in part stemming from the court's failure to credit him for a $36,400 pendente lite payment that he made to the plaintiff.[19] After a careful review of the record, we conclude that the court did not abuse its broad discretion in distributing the parties' assets, particularly in light of the court's findings that the defendant (1) was at fault for the breakdown of the parties' marriage and (2) engaged in financial maneuvers that dissipated the parties' funds and left the plaintiff with less funds available in her bank accounts. Thus, the defendant's claim fails.[20]

## III

The defendant next claims that the trial court abused its discretion in denying three of his motions to reargue, docket entries ##215.00, 216.00, and 217.00 (motions to reargue ##215.00, 216.00, and 217.00, collectively).[21] This claim merits little discussion.

"[I]n reviewing a court's ruling on a motion to open, reargue, vacate or reconsider, we ask only whether the court acted unreasonably or in clear abuse of its discretion. . . . When reviewing a decision for an abuse of discretion, every reasonable presumption should be given in favor of its correctness. . . . As with any discretionary action of the trial court . . . the ultimate [question for appellate review] is whether the trial court could have reasonably concluded as it did.

. . . [T]he purpose of a reargument is . . . to demonstrate to the court that there is some decision or some principle of law which would have a controlling effect, and which has been overlooked, or that there has been a misapprehension of facts. . . . It also may be used to address . . . claims of law that the [movant] claimed were not addressed by the court. . . . [A] motion to reargue [however] is not to be used as an opportunity to have a second bite of the apple . . . ." (Internal quotation marks omitted.) *First Niagara Bank, N.A.* v. *Pouncey*, supra, 204 Conn. App. 440.

The defendant maintains on appeal that motions to reargue ##215.00, 216.00, and 217.00 raised viable claims entitling him to reargument[22] with respect to the court's (1) failing to offset $46,000 against the $49,167 awarded to the plaintiff in unpaid unallocated support; see part I B of this opinion; and (2) entering its "unconscionable cumulative" orders distributing the parties' assets.[23] See part II of this opinion. As we have concluded previously in this opinion, the court neither erred in awarding the plaintiff $49,167 in unpaid unallocated support without offsetting the $46,000 escrowed amount nor abused its discretion in distributing the parties' assets. The record does not reflect that the court overlooked any controlling principle of law or misapprehended the facts in relation to its orders. Accordingly, we conclude that the court did not abuse its discretion in denying motions to reargue ##215.00, 216.00, and 217.00.

The judgment is reversed only as to the denial of the defendant's motion to reargue, docket entry #214.00, and the grants of the plaintiff's motions for contempt, docket entries ##110.00 and 111.00, in whole or in part, insofar as the defendant was adjudicated in contempt of the automatic orders for actions that he committed in October, 2019, prior to service of the automatic orders on him, and the case is remanded with direction to enter orders consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Practice Book § 25-5 provides in relevant part: "The following automatic orders shall apply to both parties . . .

"(b) In all cases involving a marriage or civil union, whether or not there are children:

"(1) Neither party shall sell, transfer, exchange, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action. . . .

"(2) Neither party shall conceal any property. . . .

"(4) Neither party shall cause any asset, or portion thereof, co-owned or held in joint name, to become held in his or her name solely without the consent of the other party, in writing, or an order of the judicial authority. . . ."

"The automatic orders are intended to keep the financial situation of the parties at a status quo during the pendency of the dissolution action." (Internal quotation marks omitted.) *Fronsaglia* v. *Fronsaglia*, 202 Conn. App. 769, 778 n.5, 246 A.3d 1083 (2021).

[2] Throughout the trial, the plaintiff's counsel referred to the contempt motions when presenting evidence to the court.

[3] On November 16, 2022, the court issued a corrected memorandum of decision, the purpose of which was to make a correction to its child support orders, which correction is not germane to this appeal.

[4] The court denied two other motions for contempt, one filed by the plaintiff and the other filed by the defendant. Those rulings are not at issue in this appeal.

[5] In her objections to the defendant's motions to reargue, the plaintiff also requested that the court award her attorney's fees. Although the court sustained the plaintiff's objections, it denied her requests for attorney's fees. The plaintiff has not filed a cross appeal claiming error as to the court's denial of her requests for attorney's fees.

[6] For ease of discussion, we address the defendant's claims in a different order than they are presented in his principal appellate brief.

[7] In motion to reargue #214.00, the defendant cited to contempt motions ##110.00 and 111.00; however, his analysis referred only to his transfers of the $196,000 in funds in October, 2019, which was the basis of contempt motion #111.00. We construe motion to reargue #214.00 to encompass both contempt motions ##110.00 and 111.00 insofar as they were predicated on conduct in which the defendant engaged in October, 2019.

[8] The court also summarily sustained the plaintiff's objection to motion to reargue #214.00, in which the plaintiff argued in relevant part that (1) the defendant failed to present any case law to support his position, (2) the court's "decision is clear on its face that [the contempt adjudication] is consistent with the relevant statutes supported by the evidence presented," and (3) a trial court is authorized to award attorney's fees without making an adjudication of contempt.

[9] In contempt motion #110.00, the plaintiff asserted that the defendant began receiving $15,000 per month in disability payments in October, 2019, and that he had failed to deposit any such payments into the parties' joint checking account through the date of the motion, or March 10, 2020. In other words, the plaintiff contended that the defendant was in contempt of the automatic orders for failing to deposit the $15,000 monthly disability payments between October, 2019, and March 10, 2020. The plaintiff additionally asserted in contempt motion #110.00 that the defendant violated the automatic orders in (1) failing to deposit $12,500 in monthly income from a consulting job, which began in December, 2019, and (2) creating a limited liability company in January, 2020, without her consent. We construe the defendant's claim to be challenging the court's grant of contempt motion #110.00 only insofar as the court adjudicated the defendant in contempt of the automatic orders for his actions in October, 2019.

[10] The plaintiff argues that the issue of whether the court properly adjudicated the defendant in contempt of the automatic orders for his conduct in October, 2019, is unpreserved, and, therefore, we should decline to review it because the defendant raised the issue for the first time in motion to reargue #214.00. We disagree. As this court recently stated, although raising an issue for first time in a motion to reargue "generally does not preserve [the] issue for appellate review"; *Curley* v. *Phoenix Ins. Co.*, 220 Conn. App. 732, 745, 299 A.3d 1133, cert. denied, 348 Conn. 914, 303 A.3d 260 (2023); "[a]lerting the trial court to matters that the court may have overlooked is the proper use of a motion to reargue." Id., 750. The record demonstrates that (1) the defendant, in motion to reargue #214.00, raised the legal issue of whether his conduct before service of the automatic orders on him constituted contempt of the automatic orders, (2) the plaintiff filed an objection to motion to reargue #214.00, in which she acknowledged and briefly addressed this legal issue, (3) the court denied motion to reargue #214.00, and (4) the defendant on appeal is claiming that the court abused its discretion in denying motion to reargue #214.00. Under these circumstances, we conclude that the issue of whether, as a matter of law, the court properly adjudicated the defendant in contempt of the automatic orders for his conduct that predated service of the automatic orders on him is preserved for our review in this appeal.

[11] In its decision, the court cited *Dobozy* v. *Dobozy*, 241 Conn. 490, 497, 697 A.2d 1117 (1997), for the proposition that it was authorized to award attorney's fees without adjudicating the defendant in contempt. Although the defendant's briefs make isolated references to the court's award of $25,000 in attorney's fees in relation to the plaintiff's various contempt motions, we do not construe the defendant's claims on appeal to include a request that we order the court on remand to recalculate, or to consider recalculating, attorney's fees. Even if such relief were encompassed in the defendant's claims, the defendant has not briefed on appeal the issue of

whether reversing the court's contempt adjudications necessitates a reversal or reconsideration of the attorney's fees award. Moreover, in his principal appellate brief, the defendant acknowledges that, "even in the absence of a finding of contempt, a trial court has broad discretion to make whole any party who has suffered as a result of another party's failure to comply with a court order." (Internal quotation marks omitted.) *O'Brien* v. *O'Brien*, 326 Conn. 81, 99, 161 A.3d 1236 (2017).

[12] With respect to the defendant's employment history, the trial court found in relevant part that (1) between December, 2016, and February, 2019, the defendant was employed by Revlon, (2) a period of severance, short-term disability payments, and long-term disability payments followed the defendant's separation from Revlon, (3) between December 15, 2019, and March 29, 2020, the defendant, through his limited liability company, worked as a consultant for HairClub, and (4) the defendant thereafter was employed directly by HairClub.

[13] In his posttrial proposed orders, the defendant also had requested that the court credit him for the $46,000 that he had placed in escrow pursuant to the stipulation.

[14] The court also summarily sustained the plaintiff's objection to the defendant's motion to reargue, in which the plaintiff argued that the defendant's motion constituted an attempt to have a "second bite at the apple . . . ."

[15] In his principal appellate brief, the defendant also contended that the court improperly adjudicated him in contempt of the stipulation following March 15, 2021, which, the defendant posited, was the date on which the unallocated support payments were scheduled to end under the terms of the stipulation. In his reply brief, however, the defendant states that he "recognizes that, at the time of the trial court's decision, that figure [meaning the amount of unpaid unallocated support] had risen to $49,167." Likewise, during oral argument before this court, the defendant's counsel represented that the defendant did not contest the court's finding that he owed the plaintiff $49,167 in unpaid unallocated support. We construe these statements to be concessions by the defendant that he underpaid the plaintiff $49,167 in unallocated support under the stipulation, which amount, on the basis of the record, necessarily included underpayments remitted by the defendant after March 15, 2021. In other words, we conclude that the defendant has abandoned his claim regarding the propriety of the contempt adjudication vis-à-vis the plaintiff's September 11, 2020 motion for contempt.

[16] The court found that the plaintiff had $3800 in her bank accounts and that the defendant had $22,626 in his bank accounts.

[17] The defendant's financial affidavit, dated March 3, 2022, which was entered into evidence at trial, reflected that the current total value of the defendant's retirement accounts was $605,572.

[18] The court entered additional property allocation orders, including ordering that the parties would retain their respective motor vehicles and personal property.

[19] Paragraph 7 of the stipulation; see part I B of this opinion; required the defendant, inter alia, to transfer $36,400 to the plaintiff, constituting the cost of one year of rent and a security deposit for an apartment for the plaintiff and the parties' child.

[20] The defendant separately claims that the court abused its discretion in failing to credit him $85,197, representing the value of his premarital retirement assets less $53,000 of the plaintiff's premarital retirement assets that, the court found, the parties had utilized during their marriage. Although he concedes that allocating the parties' premarital assets was within the ambit of the court's authority, the defendant maintains that awarding the plaintiff 60 percent of his premarital retirement assets was inequitable. For the same reasons set forth in part II of this opinion, we discern no abuse of discretion by the court in its allocation of the defendant's premarital retirement assets.

[21] We address the defendant's distinct claim concerning a fourth motion to reargue, motion to reargue #214.00, in part I A of this opinion.

[22] Motions to reargue ##215.00, 216.00, and 217.00 also requested permission to present additional evidence. As the defendant's counsel clarified during oral argument before this court, the defendant is not claiming on appeal any error by the trial court in failing to open the record and to permit him to introduce additional evidence.

[23] In his reply brief, the defendant states that "[a] substantial reason for filing [motions to reargue ##215.00, 216.00, and 217.00] is that, rather than schedul[ing] and hear[ing] the pending motions for contempt that remained at the time of trial, the . . . court, without notice to the parties, decided the [contempt] motions at the conclusion of trial, apparently based upon

the evidence presented at trial. The difficulty with that is that the defendant had no opportunity to specifically address the motions for contempt, and [to create] a record as needed.'' During oral argument before this court, the defendant's counsel clarified that the defendant is not claiming that the court committed error by not holding a separate hearing on the plaintiff's contempt motions. Thus, we do not discern the defendant to be pursuing a claim of error on appeal contesting the court's procedure in resolving the plaintiff's contempt motions. Moreover, as we noted previously in this opinion, (1) the court asked the parties on the first day of trial to ''confirm the motions going forward,'' (2) the plaintiff's counsel identified six pending contempt motions filed by the plaintiff, and (3) the plaintiff's counsel referred to the contempt motions when presenting evidence to the court throughout the trial.

———————————————————